# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

## No. ACM 39728

————————————

### UNITED STATES
*Appellee*

v.

### Jamie L. BROWN
Master Sergeant (E-7), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 16 August 2021

————————————

*Military Judge:* Christina M. Jimenez.

*Approved sentence:* Dishonorable discharge, confinement for 34 months, and reduction to E-4. Sentence adjudged 22 March 2019 by GCM convened at Moody Air Force Base, Georgia.

*For Appellant:* Major David A. Schiavone, USAF; Robert A. Feldmeier, Esquire.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Jessica L. Delaney, USAF; Major Dayle P. Percle, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, LEWIS, and CADOTTE, *Appellate Military Judges.*

Chief Judge JOHNSON delivered the opinion of the court, in which Senior Judge LEWIS and Judge CADOTTE joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

JOHNSON, Chief Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of attempted sexual assault and one specification of sexual assault in violation of Articles 80 and 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 920.[1,2] The court members sentenced Appellant to a dishonorable discharge, confinement for 34 months, and reduction to the grade of E-4. The convening authority approved the adjudged sentence but waived mandatory forfeitures for a period of six months for the benefit of Appellant's spouse and dependent children.

Appellant raises nine issues on appeal: (1) whether Appellant's convictions are legally and factually sufficient; (2) whether the military judge erred in denying the Defense's motion to sever charges; (3) whether the military judge provided erroneous instructions on findings; (4) whether trial counsel's closing argument was improper; (5) whether trial defense counsel were ineffective; (6) whether the military judge erred when she refused to permit the Defense to confront the victim with evidence contained in the Sexual Assault Forensic Examination (SAFE) report; (7) whether the non-unanimous verdict violated Appellant's Fifth Amendment[3] and Sixth Amendment[4] rights in light of *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020); (8) whether Appellant is entitled to relief for unlawful post-trial punishment that is not raised in the record of trial and does

---

[1] Unless otherwise noted, all references in this opinion to the UCMJ, Rules for Courts-Martial, and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] The attempted sexual assault of which the court-martial convicted Appellant was a lesser-included offense of a second charged sexual assault in violation of Article 120, UCMJ, of which the court-martial found Appellant not guilty. The court-martial also found Appellant not guilty of two specifications of abusive sexual contact on a child and one specification of indecent liberties with a child, in violation of Article 120, UCMJ (*Manual for Courts-Martial, United States* (2008 ed.) (2008 *MCM*)), and four specifications of battery upon a child under the age of 16 years, in violation of Article 128, UCMJ, 10 U.S.C. § 928 (*Manual for Courts-Martial, United States* (2002 ed.), 2008 *MCM*, and *Manual for Courts-Martial, United States* (2012 ed.)).

[3] U.S. CONST. amend. V.

[4] U.S. CONST. amend. VI.

not amount to cruel or unusual punishment in violation of the Eighth Amendment[5] or Article 55, UCMJ, 10 U.S.C. § 855;[6] and (9) whether Appellant is entitled to relief for unreasonable appellate delay.

We have carefully considered issues (7) and (8), and we find they warrant neither further discussion nor relief. *See United States v. Willman*, ___ M.J. ___, No. 21-0030, 2021 CAAF LEXIS 697, at *6 (C.A.A.F. 21 Jul. 2021); *United States v. Jessie*, 79 M.J. 437, 444–45 (C.A.A.F. 2020); *United States v. Easton*, 71 M.J. 168, 175 (C.A.A.F. 2012); *United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). As to the remaining issues, we find no error that materially prejudiced Appellant's substantial rights, and we affirm the findings and sentence.[7]

## I. BACKGROUND

In June 2017, Appellant completed a one-year assignment at Kunsan Air Base (AB), Republic of Korea. On 15 June 2017, Appellant was at the all-ranks club on Kunsan AB when he was introduced to NM[8] by a mutual friend. NM was a married female stationed at Osan AB, Republic of Korea, who frequently visited her then-husband, Senior Airman (SrA) TM,[9] at Kunsan AB where he was stationed. During their conversation, NM learned that Appellant was due

---

[5] U.S. CONST. amend. VIII.

[6] We have slightly reordered the issues presented in Appellant's brief. Appellant personally asserts issues (7) and (8) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[7] Although not raised by Appellant, we note the convening authority erroneously failed to state the reasons why he denied Appellant's post-trial request that the reduction in grade and automatic forfeitures be deferred until convening authority action on the sentence pursuant to Articles 57(a)(2) and 58b(a)(1), UCMJ, 10 U.S.C. §§ 857(a)(2), 858b(a)(1). *See United States v. Sloan*, 35 M.J. 4, 7 (C.M.A. 1992), *overruled on other grounds by United States v. Dinger*, 77 M.J. 447, 453 (C.A.A.F. 2018); *see also* R.C.M. 1101(c)(3), Discussion ("If the request for deferment is denied, the basis for the denial should be in writing and attached to the record of trial."). The denial was recorded in the staff judge advocate's recommendation to the convening authority which was served on the Defense, and the Defense did not object to the omission. Reviewing for plain error, under the circumstances of this case, we find the omission did not materially prejudice Appellant's substantial rights. *See United States v. Scalo*, 60 M.J. 435, 436 (C.A.A.F. 2005) (citations omitted).

[8] NM was an active duty enlisted member of the Air Force in June 2017 and at the time of Appellant's trial.

[9] NM and SrA TM were no longer married at the time of Appellant's trial.

to leave Korea soon. Appellant invited NM and SrA TM to Appellant's farewell barbeque at Osan AB on Saturday, 17 June 2017. However, NM and SrA TM remained at Kunsan AB that day and did not attend.

On 19 June 2017, Appellant was still at Osan AB awaiting his flight out of Korea. NM was also back at Osan AB. That evening NM went to dinner at an off-base restaurant with several co-workers, after which she and three of her co-workers went to a bar to play pool. At 1955, NM sent Appellant a text message which read, "So tell me you're out on the sed[10] so I can get you a drink for not making it Saturday." Appellant and a friend, Technical Sergeant (TSgt) JN, met NM at the bar where she was playing pool; however, Appellant and TSgt JN soon left, apparently because Appellant was not on good terms with the bartender. TSgt JN later invited NM to meet them at another club, which she did, bringing her pool cue. NM did not previously know TSgt JN, but in the course of the evening NM learned that TSgt JN had been deployed with her husband SrA TM and they were acquaintances. Appellant, TSgt JN, and NM later went to a hookah bar together.

At trial, NM estimated that over the course of the evening she consumed, at a minimum, four or five soju drinks,[11] three or four shots of whiskey, three or four shots of an alcoholic drink with unknown ingredients known as "Apple Pie," one shot of vodka, and perhaps more. Appellant and TSgt JN also drank alcohol throughout the evening.

After leaving the hookah bar, Appellant, TSgt JN, and NM decided to go to TSgt JN's off-base apartment. At trial, NM did not fully recall how this decision came about, but she testified:

> I remember the conversation of [the 0100 hours] curfew coming up, the fact that my dorm was on the other side of base. That there weren't going to be any taxis whenever I got through the gate to get home. So it was going to be me walking back by myself.

NM explained that it was "[o]ver a mile" to walk from the gate to her dorm and further testified, "I was in a safer place if I went with them to have somebody to look after, make sure I would get to work on time, rather than trying to walk home by myself because I don't know what could happen."

---

[10] The abbreviation "SED" refers to the "Songtan Entertainment District," an area with numerous bars and clubs located outside the Osan AB main gate.

[11] At trial, NM described soju as "Korean rice liquor" of variable strength, "commonly mixed with other things." TSgt JN described soju as "Korean rice vodka," some varieties of which were "unregulated" and "might be stronger than others."

On the way to TSgt JN's apartment, which was an approximately five-minute walk from the Osan AB main gate, the group stopped at a food truck to buy food and at a convenience store where NM bought cigarettes and Appellant and TSgt JN used the restroom. At trial, NM described her condition at this point as "very, very fuzzy." NM could not remember walking to TSgt JN's apartment. However, video introduced at trial from several security cameras in TSgt JN's apartment building depicted Appellant, TSgt JN, and NM walking through the building's parking garage and into the rear elevator. In the video, NM walks without apparent difficulty and appears to be conversing with the others, and at one point slaps hands with TSgt JN in a "high-five." NM remembered going up in the apartment building's elevator, entering the apartment, taking off her shoes, going onto the balcony to smoke at one point, and vomiting in TSgt JN's bathroom twice.

The original plan was that Appellant would sleep in TSgt JN's guest bedroom and NM would sleep on the sofa. However, after NM vomited, Appellant told TSgt JN he did not think NM should sleep on the couch. According to TSgt JN's testimony, when NM came out of the bathroom after vomiting, Appellant took her into the guest bedroom. At that point, TSgt JN went into his bedroom and went to sleep.

NM did not remember going into the bedroom. Her next memories were of briefly awakening and falling asleep again a series of times. On the first occasion, NM recalled waking up lying on her back and feeling that her shorts were unbuttoned. Her next memory was of waking up again and feeling her shirt had been removed. The next time NM woke up, she felt her arms were raised over her head and her sports bra had been pulled up to her elbows. The next time she awoke, she felt her hand had been moved onto a penis, which caused a "jerk reaction" on her part to move her hand away. On the next occasion, NM woke up and "jump[ed] because [she] felt a penis near [her] anus." The next time she awoke, NM was lying on her back and "felt what seemed to be like a penis pressing up against [her] vagina." NM testified "[i]t felt like" the "pressure" was "beginning to be inserted into [her] vagina." The next time she awoke, she was still on her back and felt a "face in [her] vagina," and specifically felt the warmth, moisture, and "heavy breathing" of a mouth, although she did not recall penetration of her vagina at that point. NM did not know how much time elapsed between each of these memories. NM testified that throughout these occasions, her eyes remained closed and she could not see anything; she felt she could not move or speak, and did not have "any control over [her] body."

NM awoke at approximately 0500 on 20 June 2017 wearing only her socks, which had a spot of vomit on them. She still felt effects from the alcohol. Appellant was also in the room. NM found her clothes on the floor, hurriedly got

dressed, and told Appellant that she needed to leave. Appellant suggested they go smoke together on the balcony. Instead, NM went to the bathroom, and when she emerged Appellant was waiting for her and again requested she smoke with him. Appellant seemed "adamant," so NM went to smoke with him on the balcony.

On the balcony, Appellant asked if NM wanted to talk about the prior night. NM said she did not. Appellant responded, "Well, I think we should for my safety." Appellant then told NM that she "got hot, [she] took off all [her] clothes, [she] started cuddling up next to him, and that [she] wanted to have sex." NM testified Appellant's account was not consistent with what she remembered. Moreover, NM testified that she would not have moved once she fell asleep drunk, that she would not leave her socks on if she was hot, and that she did not sleep naked. Appellant's claims made her angry and upset. NM then left the apartment, leaving behind her pool cue.

After she left the apartment, NM called her friend and co-worker, Staff Sergeant (SSgt) GS. NM sounded to SSgt GS like she was crying and asked SSgt GS to "cover" for her because she would be late to work. SSgt GS could tell NM was off-base because of the traffic sounds; NM said she did not know where she was, and SSgt GS helped her find her way back to the main gate. SSgt GS met NM at the gate. NM was crying and shaking, "appeared sick," and was "holding her stomach." SSgt GS later testified that NM kept repeating words to the effect of, "I'm not that dumb. I'm not that stupid. I'm a married woman." They took a taxi back to their dormitory, where they sat outside and smoked. NM was still crying and shaking and said little. NM tried to drink a sports drink, but vomited again. Eventually, SSgt GS asked NM if she needed to see the Sexual Assault Response Coordinator (SARC), to which NM responded, "Yes."

NM decided to shower before meeting with the SARC representative because she "smelled like vomit and alcohol." While NM was in the shower she made a video call to her husband, SrA TM, at approximately 0600. NM told SrA TM an abbreviated account of her memory of what occurred at TSgt JN's apartment that was largely consistent with her later trial testimony. SrA TM described NM's voice as "very shaky" and crying. After the conversation, SrA TM requested emergency leave and arrived at Osan AB later that day, where he stayed with NM for several days.

NM met with a SARC representative that day, 20 June 2017. NM underwent a Sexual Assault Forensic Examination (SAFE) on 23 June 2017. Subsequent analysis by the United States Army Criminal Investigation Laboratory (USACIL) of evidence collected during the SAFE revealed partial male DNA

profiles consistent with Appellant from swabs from NM's vaginal wall and cervix,[12] and a male DNA profile matching Appellant from NM's underwear. Also on 23 June 2017, NM met with agents of the Air Force Office of Special Investigations (AFOSI).

## II. DISCUSSION

## A. Legal and Factual Sufficiency

### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218 (C.A.A.F. 2018), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States*

---

[12] The USACIL report indicated "[Appellant] and his paternal male relatives cannot be excluded from the partial Y-STR DNA profile[s]" obtained from NM's vaginal swabs and cervical swabs. "The probability of randomly selecting a male individual with this profile from the same population group as [Appellant]" would be 1 in 1300 for the vaginal swabs and 1 in 390 for the cervical swabs, respectively.

*v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citation omitted), *aff'd*, 78 M.J. 218 (C.A.A.F. 2018) (quoting *Washington*, 57 M.J. at 399).

Appellant's conviction for sexual assault in violation of Article 120, UCMJ, required the Government to prove: (1) on or about 20 June 2017, at or near Osan AB, Republic of Korea, Appellant committed a sexual act upon NM by causing penetration of NM's vulva by Appellant's penis; (2) Appellant did so when NM was incapable of consenting to the sexual act due to impairment by alcohol; and (3) Appellant knew or reasonably should have known NM was incapable of consenting to the sexual act due to impairment by alcohol. *See Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), pt. IV, ¶ 45.b.(3)(f). Appellant's conviction for attempted sexual assault in violation of Article 80, UCMJ, required the Government to prove: (1) on or about 20 June 2017, at or near Osan AB, Republic of Korea, Appellant did a certain act, that is, attempted to penetrate NM's vulva with his tongue when NM was incapable of consenting to the sexual act due to impairment by alcohol, and NM's impairment was known or reasonably should have been known by Appellant; (2) that Appellant did the act with the specific intent to commit the offense of sexual assault in violation of Article 120, UCMJ; (3) that the act amounted to more than mere preparation; and (4) that the act apparently tended to bring about the commission of the intended sexual assault. *See* 2016 *MCM*, pt. IV, ¶ 4.(b), ¶ 45.b.(3)(f). "The term 'consent' means a freely given agreement to the conduct at issue by a competent person." 10 U.S.C. § 920(g)(8)(A). A person is incapable of consenting if she lacks the cognitive ability to appreciate the sexual conduct in question or lacks the physical or mental ability to make or to communicate a decision about whether she agrees to the conduct. *See United States v. Pease*, 75 M.J. 180, 185–86 (C.A.A.F. 2016) (citation omitted).

**2. Analysis**

### *a. Sufficiency of the Government's Evidence*

The Government introduced sufficient evidence for a rational trier of fact to find every element of the offenses proven beyond a reasonable doubt. Although at trial NM did not specifically remember Appellant's penis penetrating her,[13] the DNA evidence obtained from NM's cervix, vaginal wall, and underwear, coupled with all of the other circumstantial evidence, was powerful proof Appellant's penis had in fact penetrated her vulva. *See King*, 78 M.J. at 221 (citations omitted) ("[T]he [G]overnment is free to meet its burden of proof with circumstantial evidence . . . ."). Similarly, although NM testified she did not

---

[13] The SAFE report created on 23 June 2017 and admitted into evidence recorded that NM said at that time she "slightly remember[ed] penetration," without specifying body parts.

specifically remember feeling Appellant's tongue, her testimony that she felt a mouth on her vagina, under the circumstances, was convincing evidence that Appellant at least attempted to penetrate her vulva with his tongue.

Most of the litigation, at trial and on appeal, concerns whether the Government proved NM was incapable of consenting to the sexual acts due to her impairment by alcohol. We find that a rational trier of fact could find this element proven beyond a reasonable doubt. Several considerations lead us to this conclusion.

NM testified that she consumed a large quantity of alcohol that night, including several drinks of unknown strength. Although testimony indicated NM was an experienced drinker, further evidence indicated NM's physical and mental state were heavily impaired by alcohol at the time of the offenses. Although NM was able to walk and converse before she arrived at TSgt JN's apartment, her memory was already being affected and she described partial blackouts in her testimony. After arriving at the apartment, NM vomited twice in TSgt JN's bathroom. When SSgt GS saw NM the following morning, she still appeared ill and vomited again. Most significantly, NM testified that as she intermittently awoke and lost consciousness as Appellant undressed her and sexually assaulted her, she felt that she could not speak, move, or open her eyes. The court members observed NM's testimony and evidently found her credible. We do as well.

Furthermore, the evidence indicates NM's impairment by alcohol would have been obvious to Appellant. Appellant was with NM for most of the evening, including most of the time during which she was consuming alcohol. He knew that she was ill to the point of vomiting, and according to TSgt JN used her illness to justify taking her into the guest bedroom. Appellant was evidently with her throughout the night, undressed her himself, and would have observed her unresponsiveness and immobility.

NM's testimony regarding Appellant's behavior after she awoke suggested his consciousness of guilt and strengthened the Government's case. Appellant insisted on talking to NM about the previous night for his own "safety." Appellant did not ask NM what she remembered or what she thought about the events of the prior night. Instead, as described by NM, Appellant appears to have assumed either that NM would not remember, or could be pressured into accepting Appellant's manifestly self-serving version of events. Either explanation tends to suggest consciousness of guilt on his part. NM explained that what Appellant described was both contrary to the memories she did have, and did not make sense given how she reasonably would have behaved.

### b. Appellant's Arguments

Appellant does not contest the sufficiency of the evidence that he committed the sexual act of penetrating NM's vulva with his penis and attempted to penetrate her vulva with his tongue. Instead, he raises several arguments related to the sufficiency of the evidence of NM's impairment by alcohol. We address the most significant of these in turn.

As at trial, Appellant emphasizes the security video which depicts NM walking unassisted and conversing with Appellant and TSgt JN before she arrived at TSgt JN's apartment. In addition, Appellant notes that after trial defense counsel had NM watch the video during her cross-examination, NM agreed with trial defense counsel's statement that "you can't confidently say that you weren't -- just like you were in the video, awake, active, engaged and you just don't remember it." We are not persuaded. The security video does not depict the point in time that is relevant to the charge, which is when Appellant was committing the offenses. A rational trier of fact could conclude that neither the video nor NM's admission on cross-examination, based on her partial lack of memory, counteract NM's clear and repeated testimony that, while Appellant was undressing and assaulting her in the guest bedroom, she felt she could not speak or move.

Appellant contends NM's marriage to SrA TM provided "a strong motive for an alleged victim to transform an ill-advised consensual encounter into a non-consensual one." We agree that desire to protect a marriage relationship can be a motive to deny or misrepresent a consensual extramarital sexual encounter. However, a rational factfinder could reasonably conclude the evidence in this case suggests such a scenario. There is no evidence of flirtatious behavior between NM and Appellant at any point. By all accounts, NM began vomiting at TSgt JN's apartment and vomited again the following morning. Appellant's description to NM of a consensual encounter is patently self-serving, implausible, and suggestive of consciousness of guilt. Furthermore, the court members observed NM's testimony and evidently found her credible.

Appellant argues NM gave differing accounts of the alleged sexual assault to the SARC representative, during her video call with SrA TM, and during her SAFE. For example, according to SSgt GS,[14] NM told the SARC representative that she initially went to sleep on TSgt JN's couch; whereas she told SrA TM she went to sleep on the couch, woke up to vomit in the bathroom, and then woke up in the bed with Appellant trying to have sexual intercourse with her; and she told the sexual assault medical forensic examiner that she was not

---

[14] SSgt GS was present when NM spoke with the SARC representative on 20 June 2017.

sure whether Appellant penetrated her vagina. We find none of these minor distinctions significant, and we find that on the whole NM's descriptions of events in TSgt JN's apartment were substantially consistent.

Appellant compares his case to two cases in which our sister courts found sexual assault convictions to be factually insufficient. We find neither comparison persuasive.

The facts of *United States v. Pease*, 74 M.J. 763 (N.M. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 180 (C.A.A.F. 2016), are similar to the instant case in some respects. In *Pease*, the appellant was convicted of committing sexual assault against two alleged victims who were incapable of consenting due to intoxication by alcohol. *Id.* at 764. There was testimony regarding how much alcohol the alleged victims consumed on the nights in question and how intoxicated they appeared to be, and one of the alleged victims testified that she vomited during the charged sexual assault. Each alleged victim had only fragmentary memories of the periods when the charged sexual assaults occurred. The United States Navy-Marine Corps Court of Criminal Appeals (NMCCA) concluded, based on the "totality of the record," that the Government had failed to prove beyond a reasonable doubt that the alleged victims were incapable of consenting, or that the appellant knew or reasonably should have known they were incapable of consenting. *Id.* at 770. However, there are substantial differences between *Pease* and the instant case. The NMCCA noted that one of the alleged victims remembered kissing the appellant and telling him he was "cute," and of supporting her own weight on her elbows while having sexual intercourse with him. *Id.* at 771. The other alleged victim testified that she remembered she enjoyed some of the sexual activity with the appellant, that at one point she was on top of him and at another point was supporting herself on her hands and knees, and that when she did not like an activity she told the appellant so and he stopped. *Id.* at 768, 771. In contrast, NM provided no equivalent testimony in the instant case; on the contrary, she testified that while the offenses were occurring she felt that she could not speak or move, and—other than Appellant's self-serving assertion the following morning—there was no evidence NM actively participated.

Appellant's comparison to *United States v. Dorr*, ARMY 20170172, 2019 CCA LEXIS 229 (A. Ct. Crim. App. 22 May 2019) (unpub. op.), is similarly unconvincing. In *Dorr*, the appellant testified at trial that the sexual encounter was consensual, albeit rough, and his account was corroborated to an extent by physical evidence, such as visible hickeys on the appellant's neck. *Id.* at *5. In contrast, the alleged victim "remember[ed] nothing about the sexual interaction with appellant, other than a snippet where appellant was on top of her, engaged in sexual intercourse, telling [her] that she was beautiful." *Id.* Appellant emphasizes that in *Dorr*, the evidence included a video taken outside a

bar shortly before the alleged victim and the appellant returned to their barracks together; although the video showed the alleged victim was "without question" drunk, it also indicated she had the "ability to understand her surroundings and freely interact with those around her, to include [the] appellant." *Id.* at *7–8. We agree with our sister court and with Appellant "[t]hat lack of memory . . . does not equate with an inability to consent." *Id.* at *8; *see also United States v. Yates*, No. ACM 39444, 2019 CCA LEXIS 391, at *18 (A.F. Ct. of Crim. App. 30 Sep. 2019), *rev. denied*, 80 M.J. 80 (C.A.A.F. 2020) ("[T]he essential question with regard to proof of the offense of sexual assault is not how alcohol affected [the victim's] memory of that night, but how it affected her capacity to consent to sexual activity."). However, *Dorr* is clearly distinguishable from the instant case by Dorr's testimony, by the physical evidence supporting that testimony, and again most importantly, by NM's testimony regarding her inability to move or speak in response to Appellant's actions.

### c. Conclusion as to Legal and Factual Sufficiency

Drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's convictions for sexual assault and attempted sexual assault beyond a reasonable doubt. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

## B. Severance

### 1. Additional Background

In addition to the two specifications of sexual assault committed against NM, Appellant was charged with several alleged offenses against his stepdaughter AS, including two specifications of abusive sexual contact on a child and one specification of indecent liberties with a child, and four specifications of battery upon a child under the age of 16 years. The charged offenses against AS allegedly occurred between March 2005 and January 2013, and were unrelated to the June 2017 offenses against NM.

Before trial, the Defense moved to sever the specifications involving AS from the specifications involving NM to prevent "manifest injustice." The Defense contended that the allegations involving AS would inevitably impermissibly spill over into the court members' consideration of the charged sexual assaults against NM. The Government opposed the motion, contending there was no danger of spillover because the circumstances of the alleged offenses involving AS and NM were "radically different," and the Defense had failed to demonstrate manifest injustice.

The military judge issued a written ruling in which she applied the three-part analysis set forth in *United States v. Curtis*, 44 M.J. 106, 128 (C.A.A.F.

1996), *rev'd as to sentence on recon*, 46 M.J. 129 (C.A.A.F. 1997), found no manifest injustice, and denied the motion. The military judge provided the court members the following instructions regarding spillover:

> An accused may be convicted based only on evidence before this court, not on evidence of a general criminal disposition. Each offense must stand on its own and you must keep the evidence of each offense separate. Stated differently, if you find or believe that the accused is guilty of one offense, you may not use the finding or belief as a basis for inferring, assuming, or proving that he committed any other offense.

> The burden is on the prosecution to prove each and every element of each offense beyond reasonable doubt. Proof of one offense carries with it no inference that the accused is guilty of any other offense.

The Defense did not object to the spillover instruction or request any additional instructions with respect to spillover.

As described above, the court members found Appellant guilty of one specification of sexual assault and one specification of attempted sexual assault against NM. The court members found Appellant not guilty of all of the charged offenses against AS.

### 2. Law

We review a military judge's ruling on a motion to sever for an abuse of discretion. *United States v. Giles*, 59 M.J. 374, 378 (C.A.A.F. 2004) (citation omitted). "A military judge abuses [her] discretion when [her] findings of fact are clearly erroneous, when [she] is incorrect about the applicable law, or when [she] improperly applies the law." *United States v. Roberts*, 59 M.J. 323, 326 (C.A.A.F. 2004).

"The military justice system encourages the joinder of all known offenses at one trial . . . ." *United States v. Simpson*, 56 M.J. 462, 464 (C.A.A.F. 2002) (citing Rule for Courts-Martial (R.C.M.) 601(e)(2)). "Under R.C.M. 906(b)(10), a military judge is required to grant a severance motion when necessary to avoid a 'manifest injustice.'" *Giles*, 59 M.J. at 378. On appeal, "the appellant must demonstrate more than the fact that separate trials would have provided a better opportunity for an acquittal;" he must demonstrate "the ruling caused actual prejudice by preventing the appellant from receiving a fair trial." *Id.* (citations omitted). Appellate courts review such rulings by applying the same factors employed by the military judge: "(1) Do the findings reveal an impermissible crossover of evidence? (2) Would the evidence of one offense be admissible proof of the other? (3) Did the military judge provide a proper limiting instruction?" *Id.* (citing *Curtis*, 44 M.J. at 128).

Court members are presumed to follow the military judge's instructions in the absence of evidence to the contrary. *See United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (citations omitted).

### 3. Analysis

The military judge did not abuse her discretion by denying the defense motion to sever the specifications. As to the first *Curtis* factor, the military judge concluded that the evidence of Appellant's alleged offenses against AS were not admissible to prove Appellant sexually assaulted NM, and vice versa. For purposes of our analysis, we agree. *See generally United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016). We further agree with the military judge that the remaining two *Curtis* factors support denial of the motion to sever.

The military judge correctly anticipated that she would give appropriate limiting instructions and indicated she would entertain requests for additional instructions. She in fact gave the members appropriate instructions, to which trial defense counsel did not object and requested no supplemental instructions.

Furthermore, contrary to Appellant's argument on appeal, the findings do not demonstrate impermissible spillover. We agree with the military judge that the separation in time and dissimilarity of the circumstances between the alleged offenses against AS and NM reduced the risk that the court members would impute evidence with regard to one alleged victim as proof of offenses allegedly committed against the other. Moreover, the fact that the court members acquitted Appellant of all the alleged offenses against AS indicates they could distinguish between the two sets of offenses. *Cf. United States v. Kerr*, 51 M.J. 401, 407 (C.A.A.F. 1999) (stating "the record negates any reasonable possibility of spillover" where the appellant "was convicted of only one of the three specifications of indecent assault"). Moreover, we note trial counsel generally adhered to the military judge's admonition to keep the evidence of the two sets of charges separate, and Appellant does not contend otherwise. Appellant's argument regarding proof of spillover is essentially that the Government's proof of the offenses against NM was weak; we disagree for the reasons stated above in our review of the legal and factual sufficiency of the evidence. Accordingly, we conclude the military judge properly denied the severance motion and Appellant was not denied a fair trial. *See Giles*, 59 M.J. at 378.

## C. Findings Instructions

### 1. Additional Background

Trial defense counsel requested that the military judge provide the court members with the following special instructions regarding intoxication and capacity to consent.

a. You have heard evidence that [NM] consumed alcohol on the night in question. Some, or perhaps all, of you have received some type of training in the military about the relationship between alcohol and sexual activity. You may have been told, for example, that someone who drinks alcohol cannot consent to sexual acts. That is an incorrect statement of the law. You are required to follow the law as I instruct you, and you must ignore any training or briefings you have received outside of this courtroom regarding the issue of alcohol and its effect on the ability of a person to consent to sexual acts. The law does not prohibit engaging in sexual acts with a person who is drunk or impaired by alcohol.[ ] A person may be impaired by alcohol, yet still possess the applicable levels of ability. Charge I, Specifications 1 and 2 allege sexual assault when [NM] was incapable of consenting. As such, the relevant question is whether [NM] lacked the cognitive ability to appreciate the sexual conduct in question, or the physical or mental ability to make or to communicate a decision about whether she agreed to the conduct.

A person may be impaired by alcohol, yet still have the ability to make decisions and appreciate their circumstances. Put another way, a person who is impaired by alcohol may still be competent, as they may still possess the cognitive ability to appreciate the sexual conduct in question, and the physical and mental ability to make and to communicate a decision about whether they agree to the conduct. An incompetent person is a person whose impairment rises to the level of depriving him or her of the cognitive ability to appreciate the nature of the conduct in question or the physical or mental ability to communicate a decision about whether they agreed to that conduct.

b. Additionally, you have heard evidence that [NM] may have been asleep at various points throughout the evening in question. [Appellant] is not charged with the offense [of] sexual assault when [NM] was asleep. Sexual assault while the alleged victim is asleep is a separate offense under the UCMJ and one which the prosecution has not charged in this case. The prosecution in this case has charged that, at the time of the acts, [NM] was incapable of consenting due to impairment by alcohol. You are to apply the definition of "incapable of consenting" as I have previously given it to you.

In addition, the Defense requested the military judge not provide the court members with the definition of an "incompetent person." *See Military Judges'*

*Benchbook*, Dept. of the Army Pamphlet 27–9 at 602 (29 Feb. 2020) (*Benchbook*). The Government objected to the proposed special instructions.

The military judge declined to give the requested special instructions. Applying the three-part analysis the United States Court of Appeals for the Armed Forces (CAAF) set forth in *United States v. Carruthers*, 64 M.J. 340, 345–46 (C.A.A.F. 2007), the military judge found that part "a." of the proposed instruction was not a correct statement of law because it "redefines 'incompetent person' and attempts to define 'competency' by way of exception," and was therefore misleading. Furthermore, she explained that the instructions she intended to give adequately defined the elements and enabled the Defense to argue NM's capacity to consent and lack of impairment by alcohol. The military judge found part "b." of the proposed instruction "misconstrue[d] the definitions of the elements that the [G]overnment is required to prove," that the instructions she intended to provide adequately distinguished "asleep" from "impaired by alcohol," and her instructions would enable the Defense to argue the Government had failed to prove NM was incapable of consent and not merely asleep. In addition, contrary to the Defense's request, the military judge found it appropriate to provide the court members with the definition of "incompetent person."

The military judge's instructions to the court members related to consent included, *inter alia*, the following:

> "Consent" means a freely given agreement to the conduct at issue by a competent person. . . .
>
> A sleeping, unconscious, or incompetent person cannot consent.
>
> Lack of consent may be inferred based on the circumstances. All the surrounding circumstances are to be considered in determining whether a person gave consent, or whether a person did not resist or ceased to resist only because of another person's actions.
>
> A "competent person" is a person who possesses the physical and mental ability to consent.
>
> An "incompetent person" is a person who lacks either the mental or physical ability to consent because he or she is: (1) asleep or unconscious; (2) impaired by a drug, intoxicant or other similar substance; or (3) suffering from a mental disease or defect or a physical disability.
>
> To be able to freely make an agreement, a person must first possess the cognitive ability to appreciate the nature of the conduct in question and then possess the mental and physical ability to

make and to communicate a decision regarding that conduct to the other person. . . .

A person is "incapable of consenting" when she lacks the cognitive ability to appreciate the sexual conduct in question or the physical or mental ability to make or to communicate a decision about whether she agrees to the conduct.

Without objection, the military judge also instructed the court members on the defense of mistake of fact as to consent as to both offenses involving NM.

### 2. Law

Whether the military judge correctly instructed the court members is a question of law we review de novo. *United States v. Payne*, 73 M.J. 19, 22 (C.A.A.F. 2014) (citation omitted). "[A] military judge has wide discretion in choosing the instructions to give but has a duty to provide an accurate, complete, and intelligible statement of the law." *United States v. Behenna*, 71 M.J. 228, 232 (C.A.A.F. 2012) (citations omitted). "[T]he military judge . . . is required to tailor the instructions to the particular facts and issues in a case." *United States v. Baker*, 57 M.J. 330, 333 (C.A.A.F. 2002) (citations omitted).

"[A]ny party may request that the military judge instruct the members on the law as set forth in the request." R.C.M. 920(c). Denial of a defense-requested instruction is reviewed for abuse of discretion. *Carruthers*, 64 M.J. at 345–46 (citations omitted). We apply a three-part test to evaluate whether the failure to give a requested instruction is error: "(1) [the requested instruction] is correct; (2) it is not substantially covered in the main [instruction]; and (3) it is on such a vital point in the case that the failure to give it deprived [Appellant] of a defense or seriously impaired its effective presentation." *Id.* at 346 (first and second alteration in original) (quoting *United States v. Gibson*, 58 M.J. 1, 7 (C.A.A.F. 2003)). All three prongs of the test must be satisfied in order to find error. *United States v. Barnett*, 71 M.J. 248, 253 (C.A.A.F. 2012).

### 3. Analysis

Appellant contends the military judge erred with respect to findings instructions in three respects: by denying the Defense's request for special instructions; by providing an instruction regarding lack of consent; and by providing an erroneous definition of an "incompetent person." We address each contention in turn.

#### a. Denial of Defense-Requested Special Instructions

Although it is not a focus of his argument on appeal, Appellant asserts "[t]he military judge erred when she denied the defense request for a specially tailored instruction." Assessing his claim in light of the analysis set forth in *Carruthers*, we disagree. We are not as convinced as was the military judge

that the proposed special instructions were incorrect statements of law that would have been misleading. However, their substance was substantially covered by the instructions the military judge provided, and the proposed instructions did little to clarify the applicable terms and definitions. In addition, as the military judge observed, the instructions she gave enabled the Defense to argue the Government had failed to prove NM was incapable of consenting due to intoxication by alcohol and not merely asleep. Because the Defense failed to satisfy all three prongs of the test, we conclude the military judge did not abuse her discretion by denying the requested instructions.

### b. Instruction Regarding Lack of Consent

Appellant contends that the military judge erred by instructing that "[l]ack of consent may be inferred based on the circumstances" because bodily harm due to lack of consent and inability to consent due to intoxication are different and "mutually exclusive" theories of sexual assault. Although Appellant does not claim the military judge's instruction on absence of consent was an incorrect statement of the law, he argues that the instruction on the *uncharged* bodily harm theory of liability was an error of constitutional dimensions. We disagree. The military judge correctly instructed the court members on the elements of the charged sexual assaults on NM, including the requirement that the members find beyond a reasonable doubt that NM was incapable of consenting due to impairment by alcohol, and that Appellant knew or reasonably should have known NM was so impaired. Court members are presumed to follow the military judge's instructions absent evidence to the contrary. *See Taylor*, 53 M.J. at 198 (citations omitted). We see no such evidence here, and we find no basis to conclude Appellant was convicted on an uncharged bodily harm theory.

### c. Instruction on the Definition of an "Incompetent Person"

The military judge provided the court members the standard definition of an "incompetent person" from the *Benchbook*, defined as someone who lacked either the mental or physical ability to consent due to being, *inter alia*, asleep, unconscious, or impaired by a drug, intoxicant, or similar substance. Dept. of the Army Pamphlet 27–9 at 602. Appellant contends this definition erroneously suggests that incompetence "*ipso facto* results from being asleep or unconscious," when in fact sleep or unconsciousness are different theories of criminal liability from incompetence. We note that Article 120, UCMJ, does contain language that suggests sleep, unconsciousness, and incompetence are distinct conditions, rather than sleep and unconsciousness being lesser-included types of incompetence. 10 U.S.C. § 920(g)(8)(B) ("A sleeping, unconscious, or incompetent person cannot consent."); *cf. United States v. Sager*, 76 M.J. 158, 162 (C.A.A.F. 2017) (holding the words "asleep, unconscious, or otherwise una-

ware" in 10 U.S.C. § 920(b)(2) create separate theories of criminality). However, assuming for purposes of our analysis that the instruction given failed to correctly portray the relationship between incompetence and sleep, we find any such error did not materially prejudice Appellant's substantial rights. *See United States v. Payne*, 73 M.J. 19, 25 (C.A.A.F. 2014). Again, the military judge clearly and correctly instructed the court members that in order to find Appellant guilty of the charged sexual assaults against NM, they must find beyond a reasonable doubt that NM was incapable of consenting due to impairment by alcohol, and that Appellant knew or reasonably should have known NM was so impaired. Moreover, the military judge provided an accurate definition of "incapable of consenting" based on the CAAF's holding in *Pease*, 75 M.J. at 185–86 (citation omitted), which Appellant does not challenge on appeal. Accordingly, we presume the court members followed the military judge's instructions and applied the correct standard in their deliberations.

**D. Trial Counsel Closing Argument**

**1. Additional Background**

The military judge's instructions on findings included, *inter alia*, that the court members:

> have the duty to determine the believability of the witnesses. In performing this duty you must consider each witness'[s] intelligence, ability to observe and accurately remember, sincerity and conduct in court, friendships and prejudices, and character for truthfulness. Consider the extent to which each witness is either supported or contradicted by other evidence; the relationship each witness may have with either side; and how much each witness might be affected by the verdict. In weighing a discrepancy by or between witnesses, you should consider whether it resulted from an innocent mistake or a deliberate lie.

> . . .

> [Y]ou must base the determination of the issues in the case on the evidence as you remember it and apply the law as I instruct you. Counsel may refer to the instructions I have given you. If there is any inconsistency between what counsel have said about the instructions and the instructions which I gave you, you must accept my statement as being correct.

The circuit trial counsel's (CTC) closing argument on findings included the following comments regarding the military judge's instructions and the court members' determination of the credibility of witnesses:

I am going to reference some specific [instructions]. But one of the main ones I want to highlight to you, I think it's the most important instruction in this case is where the judge tells you what your duty is. It means something.

Duty. What is your duty? And it's to determine the credibility of the witnesses. That's your duty. When you go back in that deliberation room, you have to decide what does your gut tell you? What did you see on the stand? What did you see in the evidence? And you cannot throw up your hands and say, "You know what, I just don't know." You will be derelict in your duty if you do that.

. . .

But, ultimately, it's really about this: were [AS] and [NM] -- were they testifying truthfully or were they lying? Were they deliberately lying or were they telling the truth? What did you see?

So here's the instruction . . . you have the duty to determine the believability of the witnesses. It's a binary decision. They either are credible or they are not. It's one or the other. There is no in-between. There is no, "I just don't know." You have to make a decision. There is a lot of experience on this panel. All of you have the absolute capability to make that decision and come to a determination. But you cannot throw up your hands.

The CTC then rephrased the military judge's instructions regarding the factors the court members should consider in determining the believability of witnesses, and he proposed that the determination of whether an inconsistency was due to "an innocent mistake" or "a deliberate lie" presented a "binary choice." He then continued:

So, really, it comes down to this: because if they're not telling the truth, both [AS] and [NM] really must be pure evil. Both of them must have some type of grudge or some type of inherent terror [sic] or flaw in their character that wants to see an innocent man be dishonorably discharged after a full career in the service, be labeled as a sex offender, go to jail.

The circuit defense counsel (CDC) did not object during the CTC's argument, but directly responded to it and flatly rejected the contention that the credibility assessment of AS and NM presented a "binary choice" as "simply not the law and . . . not the facts of this case." The CDC continued, "[b]elievability is a sliding scale. It is not a binary choice. That is a false dichotomy that's put in front of you." The CDC proposed that a witness could "come to believe something had occurred that may not have ever occurred." He continued,

> Neither [AS] nor [NM] have to be pure evil. The defense is not saying that. They are not. Let me make that clear. They are not evil. They are not. That's not to say that, first of all, what they're telling you has been proven beyond a reasonable doubt or, two, that it even happened at all.

During rebuttal argument, the CTC returned to the subject of the court members' duty to determine credibility:

> [Y]ou have to consider the evidence. And you must use the judge's instructions to do that. You must. Because it does come down to your duty and what those instructions say. Those instructions give you a binary choice. It is exactly not what Defense Counsel said. Is it an innocent mistake or a deliberate lie? You have to decide. Absolutely, they want you to throw up your hands and fail to make a decision. And if that's the kind of individual you are, if that's what you are inside this uniform and you're incapable of making a decision, then by all means do it. But you won't be doing your duty. You won't. You won't. You must determine their credibility. You must. It has to be one or the other. Don't abdicate.

Trial defense counsel did not object to any of the above portions of the CTC's closing argument. The military judge did not interject during the closing arguments, nor did she provide supplemental instructions in light of the CTC's arguments, nor did the Defense request such instructions.

**2. Law**

"We review prosecutorial misconduct and improper argument de novo and where . . . no objection is made, we review for plain error." *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citation omitted). The burden of proof under a plain error review is on the appellant. *See United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citation omitted).

"Improper argument is one facet of prosecutorial misconduct." *Id.* (citation omitted). "Prosecutorial misconduct occurs when trial counsel 'overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *United States v. Hornback*, 73 M.J. 155, 159 (C.A.A.F. 2014) (quoting *Fletcher*, 62 M.J. at 179). Such conduct "can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, [for example], a constitutional provision,

a statute, a Manual rule, or an applicable professional ethics canon." *Id.* at 160 (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)).

"A prosecutorial comment must be examined in light of its context within the entire court-martial." *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (citation omitted). "[P]rosecutorial misconduct by a trial counsel will require reversal when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone." *Fletcher*, 62 M.J. at 184.

### 3. Analysis

On appeal, Appellant contends the CTC's arguments regarding the court members' duty to make a decision regarding the credibility of NM and AS, and to not "throw up their hands," was a misstatement of the law that undermined the Government's burden to prove his guilt beyond a reasonable doubt. Appellant reasons that a panel that cannot decide the alleged victim's credibility "is a panel which must acquit because it is uncertain of [the accused's] guilt." In contrast, Appellant contends, the CTC argued for a "polar" standard "in which [the accused's] innocence is either proven or his guilt is proven." Accordingly, he claims, the CTC committed constitutional error that was not harmless beyond a reasonable doubt. *See United States v. Mason*, 59 M.J. 416, 424 (C.A.A.F. 2004) (citations omitted).

Because trial defense counsel did not object to the CTC's argument, we review the argument for plain error. We are not persuaded Appellant has carried his burden to demonstrate "plain or obvious" prosecutorial misconduct.

As an initial matter, at no point did the CTC state or imply any requirement that the accused's "innocence" must be "proven." We are confident that such a patently incorrect characterization of the burden of proof would have drawn an objection from the Defense and corrective measures from the military judge.

The CTC's characterization of a "binary" decision did not relate to whether Appellant was guilty or innocent, but to whether the alleged victims were credible or not. This argument was rooted in the military judge's uncontested instruction that the court members had a "duty to determine the believability of the witnesses," in light of all of the considerations identified in the instructions. Certainly, the CTC and the CDC disagreed as to how this instruction should be applied in the context of Appellant's trial. However, in our view, the CTC's argument in this respect did not plainly exceed the bounds of permissible advocacy. Essentially, he argued that the court members should decide whether or not AS and NM were credible. The CDC's argument—essentially, that if the court members could not decide that AS and NM were credible, then the Gov-

ernment had failed to convince them beyond a reasonable doubt—was not fundamentally dissimilar. Neither characterization relieved the Government of its burden to prove Appellant's guilt beyond a reasonable doubt, in accordance with the military judge's instructions.

This is not to say we find no fault with the CTC's argument. His argument oversimplified and conflated related but distinct questions such as: Were AS and NM credible or not? Were any discrepancies in their testimony the result of an innocent mistake or a deliberate lie? Did AS or NM honestly believe something that was, in fact, either not true or unable to be determined beyond a reasonable doubt? We find the CTC's argument that AS and NM must either be telling the truth or be "pure evil" was grossly simplistic and exaggerated. The CDC addressed some of these oversimplifications in his own argument, and thereby perhaps diminished the CTC's credibility as an advocate and enhanced his own.

Similarly, we find the CTC's invocation of the court members' "duty" to decide the witnesses' credibility, although based on the military judge's instruction, to be overblown and unpersuasive. However, not every oversimplified or poorly conceived trial counsel argument amounts to prosecutorial misconduct. Although we do not indorse the CTC's argument, we do not find that it tended to shift the burden of proof or to otherwise "plainly or obviously" contravene another prosecutorial legal norm or standard, such that the military judge's failure to intervene *sua sponte* amounted to plain error.

### E. Ineffective Assistance of Counsel

#### 1. Law

The Sixth Amendment[15] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citation omitted). We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (citation omitted). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *Mazza*, 67 M.J. at 474).

We utilize the following three-part test to determine whether the presumption of competence has been overcome: (1) are appellant's allegations true, and

---

[15] U.S. CONST. amend. VI.

if so, "is there a reasonable explanation for counsel's actions;" (2) if the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers;" and (3) if defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result? *Id.* (alteration in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted).

### 2. Analysis

Appellant contends his trial defense counsel were ineffective in three areas: the failure to object to prior consistent statements of NM included in the SAFE report admitted as a prosecution exhibit; the failure to admit evidence of NM's marital infidelity; and the failure to call the Defense's expert consultant in toxicology as a witness. This court received sworn declarations from Appellant's two trial defense counsel, Major (Maj) PF and Captain (Capt) CE, responsive to Appellant's claims of ineffective assistance, which we have considered in relation to these issues. *See Jessie*, 79 M.J. at 442–44 (noting the CAAF has allowed the Courts of Criminal Appeals to accept affidavits to supplement the record "when necessary for resolving claims of ineffective assistance of trial defense counsel"). We address each area in turn.

### a. NM's Prior Statements in the SAFE Report

At trial, the Government called Captain (Capt) HP, a physician's assistant and the sexual assault medical forensic examiner who administered NM's SAFE on 23 June 2017. Through Capt HP, the Government introduced as Prosecution Exhibit 3 the SAFE report Capt HP prepared that day. The report included a section entitled "Patient's Description of the Assault," where Capt HP recorded NM's oral description of the sexual assault. As recorded by Capt HP, NM's brief description was largely consistent, albeit more definite in certain respects, compared to her subsequent trial testimony:

> I remember waking up to different pieces of my clothing being gone. I remember him moving my hand to touch his genitalia. I slightly remember penetration. I do remember being suddenly woken up by things coming close to my anal cavity. I remember him performing oral and I remember squirming. And then I woke up and got dressed and trying [sic] to get out. . . . I vomited prior to the assault, and then I vomited after the assault.

The Defense did not object to Prosecution Exhibit 3.

Appellant contends trial defense counsel were ineffective by failing to object to the narrative portions of Prosecution Exhibit 3 as inadmissible hearsay. Appellant argues the narrative was not admissible as a prior consistent statement

under Mil. R. Evid. 801(d)(1)(B)(i) because the statements were made after NM's motive to fabricate arose—that is, her marriage to SrA TM. *See United States v. Frost*, 79 M.J. 104, 110 (C.A.A.F. 2019). Appellant further argues the narrative was similarly not admissible under Mil. R. Evid. 801(d)(1)(B)(ii) to rehabilitate NM's credibility "when attacked on another ground," because the fact that NM made statements consistent with "parts of her in-court testimony at a time after the sexual encounter does not rebut the [Defense's] assertion that she mis-recorded memory." *See United States v. Finch*, 79 M.J. 389, 395 (C.A.A.F. 2020). Appellant further contends the narrative was not admissible pursuant to the hearsay exception for statements made for medical treatment or diagnosis under Mil. R. Evid. 803(4), because NM perceived the purpose of the SAFE was evidence-gathering rather than medical treatment. Appellant argues there was no plausible reason not to object to the narrative portions of Prosecution Exhibit 3, and, had the Defense done so, there was a reasonable probability of a more favorable result because NM's credibility "was the paramount issue" and the court members could have used her prior consistent statement to bolster NM's credibility.

In their declarations, trial defense counsel acknowledge there were potential objections to the narrative portions of Prosecution Exhibit 3, but they explain the Defense chose not to object to the SAFE report for strategic and tactical reasons. The primary reason they assert is that the report was more helpful than harmful to the Defense's theory of the case. Trial defense counsel's theory was that NM was capable of consenting, but simply could not remember portions of the night due to alcohol-induced blackouts. Therefore, they assert, evidence that NM was awake and aware of what was occurring at various points during the night tended to support their theory. Moreover, they contend events during the trial prior to the introduction of Prosecution Exhibit 3 further convinced them this was the correct strategy. In particular, they noted NM's reaction to watching the video of herself walking apparently unimpaired through the parking garage on her way to TSgt JN's apartment, and they perceived NM genuinely had no memory of doing so. To trial defense counsel, this reinforced their belief that focusing on NM's memory was the correct approach. In addition, because the Defense's theory was not that NM was being actively deceptive about the alleged sexual assault, seeking to exclude prior consistent statements was not a priority. Moreover, Capt CE explained the Defense felt it had gained credibility with the court members by being the party that introduced important evidence, including the security video and a map depicting various locations NM visited on the night of the incident, and therefore not objecting to Prosecution Exhibit 3 would continue to foster the perception that the Defense had nothing to hide.

We find there were reasonable strategic and tactical reasons why trial defense counsel did not object to the narrative portions of Prosecution Exhibit 3.

We evaluate trial defense counsel's performance not by the success of their strategy, "but rather whether counsel made . . . objectively reasonable choice[s] in strategy from the alternatives available at the [trial]." *United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001) (citation omitted). Trial defense counsel could reasonably conclude that given their trial strategy, excluding NM's prior consistent statements during the SAFE was not a priority, and that additional evidence that NM was in fact awake and aware of what was happening at various points during the alleged sexual assault, in combination with other evidence, tended to support the Defense's theory that NM had problems with her memory rather than with her capacity to consent. Accordingly, Appellant has not met his burden to demonstrate deficient performance in this respect.

### b. Evidence of Infidelity

Before trial, the Defense moved to introduce evidence of other alleged sexual behavior by NM pursuant to Mil. R. Evid. 412, including *inter alia* an alleged sexual encounter between NM and SSgt AP which occurred approximately four months after the charged offenses involving Appellant. NM reported the incident with SSgt AP as a sexual assault in October 2017.[16] The military judge conducted a closed hearing on the motion pursuant to Mil. R. Evid. 412(c)(2) at which several witnesses testified. The testimony of multiple witnesses indicated NM did report that she was sexually assaulted by SSgt AP sometime after the incident with Appellant, but she elected not to participate in a criminal prosecution. SSgt AP testified at the hearing under a grant of immunity and indicated he had a consensual sexual encounter with NM in her dormitory room. NM also testified at the hearing; in the course of her testimony, the military judge sustained objections to defense questions regarding whether NM had engaged in sexual relationships outside her marriage to SrA TM. After the hearing, the Defense withdrew its request to introduce evidence of the incident between NM and SSgt AP. Accordingly, the military judge did not rule on that portion of the Defense's motion.

Appellant contends trial defense counsel were ineffective by failing to seek to rebut NM's statements to SSgt GS on the morning after the charged sexual assault by Appellant to the effect that NM was "not that stupid" because she was "a married woman." Appellant characterizes these statements as "a claim that [NM] would never engage in consensual sexual relations with [A]ppellant because she was a married woman," which opened the door to evidence of her

---

[16] The trial transcript, appellate exhibits, and briefs addressing the Defense's Mil. R. Evid. 412 motion were sealed pursuant to R.C.M. 1103A. These portions of the record and briefs remain sealed, and any discussion of sealed material in this opinion is limited to that which is necessary for our analysis. *See* R.C.M. 1103A(b)(4).

"sexual relationship" with SSgt AP. Appellant further contends trial defense counsel were ineffective for failing to ask for reconsideration to be able to cross-examine NM regarding other sexual relationships. Appellant attributes trial defense counsel's failure to seek such rebuttal evidence after initially attempting to raise it in the Mil R. Evid. 412 hearing to a lack of "situational awareness." He asserts that, but for these errors, there was a reasonable probability of a different result because this evidence would have discredited NM, whose credibility was essential to the Government's case.

However, assuming *arguendo* the Government did open the door to such evidence, we note multiple reasonable explanations why trial defense counsel elected not to attempt to rebut NM's statements to SSgt GS with evidence of her encounter with SSgt AP. First, although NM apparently elected not to co-operate in a criminal prosecution of SSgt AP, there is no evidence she recanted her allegation of sexual assault against him. The witnesses other than SSgt AP who testified at the Mil. R. Evid. 412 hearing about her report all indicated NM referred to the incident as a sexual assault. SSgt AP himself testified that, at the time of the hearing, he was pending an administrative discharge board based on NM's allegation of sexual assault. In their declarations, trial defense counsel note that if it was true that SSgt AP sexually assaulted NM, that fact would be of no use to Appellant's defense, and the only available evidence that it was not true was the immunized testimony of SSgt AP himself.

Trial defense counsel further explain that after the Mil. R. Evid. 412 hearing, they concluded SSgt AP "would have been a terrible [d]efense witness." To begin with, the fact that NM persisted in cooperating with the prosecution of Appellant—even after her marriage with SrA TM had ended—while declining to do so in SSgt AP's case posed an obvious problem with comparing the two situations. It underscored that NM knew she had the option of not testifying against Appellant if she did not sincerely believe he sexually assaulted her. In addition, trial defense counsel explained SSgt AP had "destroyed" his own credibility at the Mil. R. Evid. 412 hearing by providing non-credible testimony as to why he went to NM's dormitory room on the night in question, and as to NM's apparent level of intoxication earlier that evening which was contradicted by "numerous unbiased witnesses."

Appellant's contention that trial defense counsel should have sought to question NM regarding extramarital sexual relationships is also unpersuasive. Appellant has failed to demonstrate any likelihood such questioning would disclose evidence materially helpful to the Defense. As discussed above, there is no indication NM recanted her allegation of sexual assault against SSgt AP, and no indication she would have done so on the witness stand. As for any other sexual relationships, trial defense counsel explain that despite their investigative efforts, they had no such evidence beyond "rumors and hearsay."

Finally, trial defense counsel further explain that they did not feel the Defense needed to rebut NM's comments to SSgt GS regarding being married because they considered her comments to be consistent with the Defense's theory of the case. They perceived her comments not as a flat denial that she would have ever consented, as Appellant contends, but rather as an expression of "confusion and regret." Recognizing that trial defense counsel were present in the courtroom to hear the testimony and observe the witnesses, and recognizing the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," we are inclined to credit trial defense counsel's assessment. *Strickland*, 466 U.S. at 689.

Accordingly, we find Appellant has failed to demonstrate deficient performance with regard to evidence of NM's alleged infidelity.

### c. Toxicology Evidence

Appellant's third allegation of ineffective assistance relates to trial defense counsel's failure to call the Defense's expert consultant in forensic toxicology, Dr. SH, to testify regarding his estimate of NM's blood alcohol concentration (BAC) at the time of the alleged sexual assault. Appellant has provided a declaration from Dr. SH dated 3 June 2020 which states, *inter alia*, that he is a board certified clinical pathologist with over 30 years of experience in pathology, pharmacology, and toxicology. Dr. SH was present during the trial testimony and also reviewed "exhibits and [AF]OSI documents." However, Dr. SH did not review the trial transcript or "most of his notes" before preparing his declaration. To "the best of [his] recollection, refreshed only by an email that [he] sent to the Defense Counsels on the evening . . . before the last trial day and a case summary note that [he] prepared" on 12 May 2019, Dr. SH estimated NM had consumed the equivalent of six or seven "standard drinks," approximately three fluid ounces of pure alcohol. Dr. SH further estimated NM's BAC was approximately 0.06 g/dL at the time she entered TSgt JN's apartment. Dr. SH further explained:

> [T]he effects of a BAC of 0.03-0.12 are mild euphoria, sociability, talkativeness, increased self-confidence, decreased inhibitions, diminished attention, judgment, and control, some sensory-motor impairment, and slowed information processing. A person's BAC must rise to the 0.09-0.25 range before deficits such as loss of critical judgment, emotional instability, impaired memory and comprehension, sensory-motor in-coordination; impaired balance; or slurred speech begin to appear. In an experienced drinker like N.M. (according to her husband's testimony), the apparent defects from any BAC would likely be less.

Dr. SH further explained that NM's BAC and impairment would have decreased from the time she entered the apartment until the time of the alleged sexual assault. Appellant contends that Dr. SH's testimony would have indicated it was "extremely unlikely" NM was incapacitated at the time of the alleged offenses.

In their declarations, trial defense counsel respond with several reasons why the Defense decided not to call Dr. SH to testify. Dr. SH's testimony did not support the Defense's theory of the case, which was that NM *was* significantly impaired by alcohol, to the degree that it interfered with her memory of the night's events. Trial defense counsel intended to rely on the security video, and they perceived that NM's apparently genuine reaction of surprise and lack of memory supported this theory. In addition, trial defense counsel explained that Dr. SH's assessment that NM had consumed the equivalent of only six or seven "standard drinks" was, by his own admission at the time, only a "guesstimate." NM's testimony indicated she had a minimum of 12 or 13 alcoholic drinks. Moreover, they explained that with alcohol in Korea being largely unregulated, "there is no such thing as a 'standard drink.'" On cross-examination, Dr. SH would have been forced to concede there was no way to know how much alcohol was in any soju drink and that NM's BAC could have been significantly higher than his estimate. In addition, trial defense counsel believed the Government's decision not to call its own expert in forensic toxicology to introduce some scientific evidence regarding incapacity was a "fatal flaw," and they did not want to give the Government the opportunity to draw out any potentially favorable concessions or other evidence from Dr. SH.

Applying the presumption of competence, we conclude trial defense counsel made a reasonable decision not to call Dr. SH to testify. Whether or not another attorney might have made an equally reasonable decision under the circumstances to call Dr. SH despite of the risks and drawbacks, we conclude Appellant has failed to demonstrate trial defense counsel's performance fell measurably below that expected of competent but fallible defense lawyers.

## F. Military Judge's Ruling Precluding Confrontation of the Victim with Evidence from the SAFE Report

### 1. Additional Background

As described above, before trial the Defense moved to introduce certain evidence of other sexual behavior by NM pursuant to Mil. R. Evid. 412. Such evidence included, *inter alia*, that "[b]etween on or about 20 June 2017 and on or about 23 June 2017, NM had sexual contact with another male that was not [Appellant]," which the Defense contended was admissible under Mil. R. Evid. 412(b)(1)(A) and (C). In addition, the Defense sought to introduce evidence that

"[d]uring the DNA analysis conducted in this case, a male DNA profile not belonging to [Appellant] or NM was discovered on NM's anal swabs, perineal swabs, right inner thigh swabs, and pubic mound swabs," which the Defense contended was constitutionally required to be admitted pursuant to Mil. R. Evid. 412(b)(1)(C).

In support of its motion, the Defense offered a copy of the SAFE report completed on 23 June 2017, which was later admitted into evidence as Prosecution Exhibit 3 as described above. One section of the report recorded that NM stated she had not engaged in "[o]ther non-assault sexual activity within past 5 days." The Defense also offered the USACIL report on testing of samples taken during NM's SAFE, which was also subsequently admitted as a prosecution exhibit. In addition to describing DNA evidence consistent with Appellant found on NM's cervical and vaginal swabs and underwear, as described above, the report indicated Appellant was excluded as the source of partial DNA profiles from an unknown male individual found on NM's right inner thigh, anal, and pubic mound swabs. A partial male DNA profile was also obtained from NM's perineal swab, but it "could not be conclusively interpreted due to a lack of sufficient genetic data."

The military judge conducted a closed hearing on the motion pursuant to Mil. R. Evid. 412(c)(2) at which several witnesses testified, including NM. NM testified SrA TM traveled from Kunsan AB to Osan AB on 20 June 2017, he stayed with her throughout the following week, and that they shared a single twin bed in her dormitory room. NM further testified they did not have sexual intercourse between 20 June 2017 and her SAFE exam on 23 June 2017. SrA TM similarly testified that he traveled to Osan AB on 20 June 2017 to stay with NM, and he stayed with her the remainder of the week.

The military judge issued a written ruling in which she denied the motion with respect to evidence that "[b]etween on or about 20 June 2017 and on or about 23 June NM had sexual contact with another male." The military judge found, *inter alia*, the evidence "provide[d] an inference that NM could have had physical contact with another male," but the Defense had produced "no evidence . . . that NM had *sexual contact* with another, within the narrow window defined by [D]efense." (Emphasis added). Because the Defense "failed to present evidence, beyond speculation," the requested evidence was "therefore neither relevant, material nor favorable to the [D]efense." Additionally, the military judge ruled the proffered evidence was "a distraction as to the charged offense," and its "probative value, if any, [was] substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the members," and therefore should also be excluded under Mil. R. Evid. 403.

However, the military judge granted the Defense's motion with respect to the USACIL analysis of the unidentified male DNA found on NM's anal, perineal, right inner thigh, and pubic mound swabs, as "relevant, material and favorable to the [D]efense" for the "narrow purpose" of NM's credibility under Mil. R. Evid. 412(b)(1)(C).

**2. Law**

"We review the military judge's ruling on whether to exclude evidence pursuant to M.R.E. 412 for an abuse of discretion." *United States v. Ellerbrock*, 70 M.J. 314, 317 (C.A.A.F. 2011) (citing *United States v. Roberts*, 69 M.J. 23, 26 (C.A.A.F. 2010)). The military judge's findings of fact are reviewed for clear error and her conclusions of law are reviewed de novo. *Id.* (citing *Roberts*, 69 M.J. at 26). "A military judge abuses [her] discretion when: (1) the findings of fact upon which [s]he predicates [her] ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if [her] application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)). "For [a] ruling to be an abuse of discretion, it must be 'more than a mere difference of opinion'; rather, it must be 'arbitrary, fanciful, clearly unreasonable' or 'clearly erroneous.'" *United States v. Collier*, 67 M.J. 347, 353 (C.A.A.F. 2009) (quoting *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (additional citations omitted)).

Mil. R. Evid. 412 provides that in any proceeding involving an alleged sexual offense, evidence offered to prove the alleged victim engaged in other sexual behavior or has a sexual predisposition is generally inadmissible, with three limited exceptions. The burden is on the defense to overcome the general rule of exclusion by demonstrating an exception applies. *United States v. Carter*, 47 M.J. 395, 396 (C.A.A.F. 1998) (citation omitted).

The first exception under Mil. R. Evid. 412 includes "evidence of specific instances of sexual behavior by the alleged victim offered to prove that a person other than the accused was the source of semen, injury, or other physical evidence." Mil. R. Evid. 412(b)(1)(A). Evidence that fits this exception may nevertheless be excluded if the probative value of the evidence is outweighed by the danger of unfair prejudice to the alleged victim's privacy. Mil. R. Evid. 412(c)(3). In addition, like other evidence, evidence otherwise admissible under Mil. R. Evid. 412(b)(1)(A) may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence." Mil. R. Evid. 403. Where a military judge conducts a proper balancing test under Mil. R. Evid. 403, an appellate court will not overturn the ruling absent a clear abuse of discretion. *United States v. Ediger*, 68

M.J. 243, 248 (C.A.A.F. 2010) (quoting *United States v. Ruppel*, 49 M.J. 247, 251 (C.A.A.F. 1998)).

The third exception under Mil. R. Evid. 412 provides that the evidence is admissible if its exclusion "would violate the constitutional rights of the accused." Mil. R. Evid. 412(b)(1)(C). Generally, evidence of other sexual behavior by an alleged victim is constitutionally required and "must be admitted within the ambit of [Mil. R. Evid.] 412(b)(1)(C) when [it] is relevant, material, and the probative value of the evidence outweighs the dangers of unfair prejudice." *Ellerbrock*, 70 M.J. at 318 (citation omitted). Relevant evidence is evidence that has any tendency to make the existence of any fact of consequence to determining the case more probable or less probable than it would be without the evidence. Mil. R. Evid. 401. Materiality "is a multi-factored test looking at the importance of the issue for which the evidence was offered in relation to the other issues in this case; the extent to which the issue is in dispute; and the nature of the other evidence in the case pertaining to th[at] issue." *Id.* (alteration in original) (internal quotation marks and citations omitted). The dangers of unfair prejudice to be considered "include concerns about 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

### 3. Analysis

The effect of the military judge's ruling was to allow the admission of the USACIL evidence that the partial DNA profile of an unidentified male, excluding Appellant, was found on certain intimate areas of NM's body; however, the Defense was not allowed to cross-examine NM regarding sexual activity with a male other than Appellant between 20 June 2017 and 23 June 2017. On appeal, Appellant asserts the military judge erred by preventing the Defense from confronting NM with the USACIL evidence which, he asserts, contradicted NM's statement recorded in the SAFE report that she had not engaged in "sexual activity" between the time of the charged offenses and undergoing the SAFE. Appellant asserts this evidence was significant because it demonstrated that either NM had a faulty memory or she made false statements during the SAFE. We conclude the military judge did not abuse her discretion.[17]

---

[17] Appellant's argument appears to be based on the "constitutionally required" exception, Mil. R. Evid. 412(b)(1)(C). Although the Defense's motion initially invoked both Mil. R. Evid. 412(b)(1)(A) and (C), the contested evidence appears to have essentially

Appellant focuses on the military judge's ruling with respect to Mil. R. Evid. 403 that any probative value was substantially outweighed by the dangers of unfair prejudice, confusion of issues, and misleading the court members. He addresses several of the factors for conducting a Mil. R. Evid. 403 analysis set forth in *United States v. Wright*, 53 M.J. 476, 483 (C.A.A.F. 2000), specifically strength of proof of the conduct in question, availability of less prejudicial evidence, risk of distraction, amount of time required for the proof, and proximity in time to the charged offenses.[18] He further contends this court should afford the military judge's ruling "minimal" deference because she did not provide a detailed analysis of Mil. R. Evid. 403. *See United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000).

However, Appellant fails to substantially address the primary basis for the military judge's ruling, which was not Mil. R. Evid. 403; it was that the Defense failed to meet its burden to provide evidence of the sexual activity it sought to introduce under Mil. R. Evid. 412. The military judge acknowledged the presence of male DNA permitted an inference that NM had recent physical contact with a male, but it did not demonstrate "sexual activity." The totality of the evidence suggests the unidentified DNA likely belonged to NM's husband SrA TM, with whom NM was living and sharing a bed between 20 June 2017 and 23 June 2017, although SrA TM's DNA was evidently not compared to the DNA from the swabs. We do not find the military judge's application of Mil. R. Evid. 412 to be arbitrary, fanciful, or clearly unreasonable. Without evidence of sexual activity—other than the sexual assault by Appellant—between 20 June 2017 and 23 June 2017, the proffered evidence did not contradict NM's statement recorded in the SAFE report and therefore it had essentially no relevance with respect to NM's credibility on the asserted basis.

---

no value in "prov[ing] that a person other than [Appellant] was the source" of the partial male DNA profiles found on NM's cervix, vagina, and underwear. Mil. R. Evid. 412(b)(1)(A).

[18] We note *Wright* did not involve Mil. R. Evid. 412; it specifically addressed the application of Mil. R. Evid. 403 in the context of the introduction of evidence the accused had committed "other [uncharged] sexual offenses" under a very different rule of evidence, Mil. R. Evid. 413. 53 M.J. at 482 ("The Rule 403 balancing test should be applied 'in light of the strong legislative judgment that evidence of prior sexual offenses should ordinarily be admissible[.]'" (alteration in original) (quoting *United States v. LeCompte*, 131 F.3d 767, 769 (8th Cir. 1997)).

**G. Appellate Delay**

**1. Additional Background**

Appellant's court-martial concluded on 22 March 2019. The convening authority took action on 26 June 2019, and the record of trial was docketed with this court on 10 July 2019.

The record consists of eight volumes and includes 1,036 pages of transcript and approximately 130 Prosecution, Defense, Appellate, and Court Exhibits.

Appellant is represented by military and civilian appellate defense counsel. Civilian appellate defense counsel entered his notice of appearance on 20 February 2020. The Defense filed is brief on behalf of Appellant on 4 June 2020, after securing eight enlargements of time in which to file the assignments of error. The Government filed its answer on 24 July 2020 after obtaining an enlargement of time in order to obtain declarations from trial defense counsel responsive to Appellant's assertions of ineffective assistance of counsel. The Defense submitted Appellant's reply brief on 19 August 2020. On 26 March 2021, Appellant filed with this court a demand for speedy appellate processing.

**2. Law**

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). In *Moreno*, the CAAF established a presumption of facially unreasonable delay where the Court of Criminal Appeals does not issue its decision within 18 months of docketing. Where there is such a facially unreasonable delay, we consider the four factors identified in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), to assess whether Appellant's due process right to timely post-trial and appellate review has been violated: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004) (per curiam)).

However, where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In *Moreno*, the CAAF identified three interests protected by an appellant's due process right to timely post-trial and appellate review: (1) preventing oppressive incarceration; (2) minimizing anxiety and concern; and (3) avoiding impairment of the appellant's grounds for appeal and ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted).

### 3. Analysis

More than 18 months have elapsed since Appellant's case was docketed with this court; accordingly, there is a facially unreasonable delay that requires analysis of the *Barker* factors.

However, we find that Appellant has not demonstrated prejudice from the delay. In this case, we find no oppressive incarceration because Appellant's appeal has not resulted in relief. Similarly, where the appeal does not result in a rehearing on findings or sentence, Appellant's ability to present a defense at a rehearing is not impaired, and Appellant has not attempted to demonstrate how any grounds for appeal have been impaired. *Id.* at 140.

With regard to anxiety and concern, the CAAF has explained "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* In this regard, Appellant has submitted a declaration asserting that he has not been able to apply for Veterans' Administration disability benefits for service-connected medical conditions because he has not received his Department of Defense (DD) Form 214 documenting his discharge from the Air Force. Appellant has attached to his declaration a "screen shot" of what he asserts is the "message which the Veterans' Administration website displayed when [he] attempted to apply for . . . disability benefits." This attachment indicates Appellant entered an anticipated date of release from active duty of 1 July 2022. Based on that date, he received a message that he was not eligible to file for disability benefits yet, but he would be able to file a claim under the Benefits Delivery at Discharge (BDD) program on 2 January 2022, six months before his anticipated release.

We find Appellant's declaration and its attachment are insufficient to demonstrate prejudice. First, we note that on 22 March 2019 Appellant was sentenced to confinement for 34 months, and he has not provided the court information on his expected release date. Appellant has made no showing that he would be able to obtain a DD Form 214 before the expiration of his term of confinement. Moreover, it is unclear why Appellant entered an anticipated active duty release date of 1 July 2022, or what relationship that date has with the appellate review of his convictions. Furthermore, the attached screen shot suggests an applicant can, in fact, begin the disability benefit application process before leaving active duty—or, presumably, receiving a DD Form 214—through the BDD program, although the information presented is entirely inadequate to draw any definite conclusions as to how the program would apply in Appellant's case.

Because we find Appellant has demonstrated no cognizable prejudice under *Moreno*, there is no due process violation unless the delay is so egregious as to impact the perception of the fairness and integrity of the military justice system. Under the circumstances of this case, we find it is not. Appellant sought and received eight enlargements of time in order to file his brief with this court. The record of trial is substantial. Appellant's lengthy brief raises substantial and complex issues requiring careful review of the record and analysis, and which have resulted in a lengthy opinion of the court. On the whole, we find no violation of Appellant's due process rights.

Recognizing our authority under Article 66, UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude it is not.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59 and 66, UCMJ, 10 U.S.C. §§ 859, 866. Accordingly, the findings and sentence are **AFFIRMED**.[19]

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

---

[19] We note multiple errors in the court-martial order which warrant correction. As reproduced in the order, Specification 2 of Charge I erroneously alleges Appellant penetrated NM's vulva with his "mouth" rather than his "tongue" as alleged on the charge sheet; Specification 4 of Charge I erroneously includes the words "by placing AS in fear that she would be subjected to grievous bodily harm," which were not on the charge sheet; the order fails to indicate a plea or finding with respect to Charge II; and the date the sentence was adjudged is erroneously given as 3 April 2019 rather than 22 March 2019. We direct the publication of a corrected court-martial order to remedy these errors.